## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| DUNWOODY RECOVERY PLACE, LLC, NORTH PEACHTREE HOLDINGS, LLC, DAVE EDMONDSON, AS GUARDIAN FOR JOHN DOE 1, SANDY DUGAN AS GUARDIAN FOR JOHN DOE 2, AND JOHN DOE 3, | ) ) ) ) CIVIL ACTION FILE NO. ) ) ) ) _____ |
| Plaintiffs, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) ) |
| THE CITY OF DUNWOODY, GEORGIA, | ) ) |
| Defendant. | ) |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Dunwoody Recovery Place, LLC ("DRP"), North Peachtree Holdings, LLC ("NPH"), Dave Edmondson, as Guardian for John Doe 1, Sandy Dugan, as guardian for John Doe 2, and John Doe 3 ("together Doe Plaintiffs)(all Plaintiffs collectively "Plaintiffs") file this Complaint against the Defendant, City of Dunwoody, Georgia ("the City"), showing the Court as follows:

## INTRODUCTION

"In May 2022, the White House published a statement about the 'national health crisis facing Americans'" and "called for a comprehensive national strategy to tackle the crisis." Jules Murtha *Best and Worst States for Mental Health Prevalence and Healthcare Access,* MDLinx, (Sept. 2, 2022)

https://www.mdlinx.com/article/ranking-the-states-for-mental-health-prevalence-and-healthcare-access/3i4sbkAQ7rEboHuft0hLXa (last visited May 14, 2025). Georgia, along with sister states, Alabama, Florida, Mississippi and Texas, falls on the side of the spectrum offering the least access to care for mental illness. *Id.* "According to a Forbes study, Georgia is the second to last worst state for mental health access and care." Lifebulb, *Georgia Ranks 2nd to Last in Access to Mental Health Care: Here's Why*, (Aug. 27, 2024) https://www.lifebulb.com/blogs (search access to mental health to locate article). Rates of mental illness across the United States have been increasing. *Id*. There have been increased rates in: anxiety disorders, depressive disorders, attention deficit/hyperactivity disorder, post-traumatic stress disorder, and substance use. *Id*. "In particular, Georgia's youth mental health has struggled. Adolescents are experiencing higher rates of depression, anxiety, substance use, and suicidal ideation without receiving proper treatment." *Id*.

The Department of Health and Human Services declared the opioid crisis a national public health emergency in October of 2017. Office of the Attorney General, *Opioid Abuse*, LAW.GEORGIA.GOV, https://law.georgia.gov/key-issues/opioid-abuse (last visited May 14, 2025). "No Georgia community is a stranger to the devastating effects of the opioid crisis. According to the Georgia Department of Public Health, the total number of opioid-involved overdose deaths

in Georgia increased by 302 percent from 2010 to 2022." *Id.* In 2023, more than 107,000 people in the United States died of an overdose with roughly seventy-five percent of those deaths involving opioids. *Id*. From 2019 to 2021, fentanyl-involved overdose deaths in Georgia increased by 232 percent among adults and a staggering 800 percent among adolescents, aged 10-19 years. Methadone, *Georgia Drug and Alcohol                                  Statistics*,                      METHADONE.ORG https://www.methadone.org/drugs/georgia-drug-alcohol-statistics/ (last visited May 14, 2025). According to data released in 2023, by the Substance Abuse and Mental Health Services Administration ("SAMHSA") about 17.3 percent of the population aged 12 or older in the United States were living with substance use disorder in 2022. Stacker, "How Many People are Receiving Substance Use Treatment in Georgia," 95.5WSB (March 26, 2024 at 6:00 p.m. EDT) https://www.wsbtv.com/news/how-many-people-are-receiving-substance-use-treatment-georgia/X3TRGUAQIFNDLN6WK6KRS5JC2Q/. Data from SAMHSA also showed that about 16.1 percent of Georgia's population has a substance use disorder. *Id*. According to Wikipedia: "As of the 2020 United States census, there were 51,683 people, 20,482 households, and 12,620 families residing in the city [Dunwoody]." (https://en.wikipedia.org/wiki/Dunwoody,_Georgia). With only seven recovery communities in Dunwoody, presumably a significant percentage of the approximately 16.1 percent of the adult population needing treatment for

3

substance use disorder is underserved.

Prior to July of 2024, DRP and its sister companies owned five (5) out of the seven (7) residential mental health and substance abuse treatment centers in the City of Dunwoody. All but one of those facilities were located in areas of the City zoned as O-I – Office Industrial District. Pursuant to amendments to the Code of the City of Dunwoody, Georgia ("the Code") in July of 2024, those residential facilities are now characterized as "Recovery Communities." Plaintiff DRP seeks to operate a facility on the property located at 4821 North Peachtree Road[1] (the "North Peachtree Location), as an extension of DRP's existing group residential recovery home for persons with mental health and substance abuse issues which is located at 4598 Barclay Drive, .42 miles from the North Peachtree Location. NPH which owns the North Peachtree Location property was in the process of remodeling the building and making improvements to the property (previously an assisted living and memory care facility) for use by DRP when the City, with full knowledge of Plaintiffs' plans for that location, issued a moratorium in February of 2023 forbidding permitting or licensing any new addiction recovery facilities in any and all zones of the City and later amended the Code in July of 2024.

---

[1] The property abuts two streets. The City of Dunwoody uses the address 4821 North Peachtree Road for this property, but the County uses the address 4954 Tilly Mill Road for the same property.

Plaintiffs believe that the City has a history of manipulating zoning ordinances and promoting pretextual reasons for its actions in order to forestall the ability of residential mental health and substance addiction treatment facilities and group homes from operating in Dunwoody. Dunwoody's former mayor once said regarding a mental health/eating disorder facility: "None of us wants this in our neighborhoods. . . ." On information and belief, in the past Dunwoody has faced legal action for some of its zoning actions. Beginning in January or February of 2023, the City began to strategize in earnest how best to limit new facilities providing residential treatment of substance abuse and mental health issues from locating within the City's boundaries. During that time, the Staff and City legal counsel set out to study how other cities limited group residential substance addiction and mental health treatment facilities under their zoning schemes. Thus, while the incidence of mental health and substance use has been increasing with a commensurate need for treatment options, the City of Dunwoody was trying to figure out how to limit those opportunities for treatment within its boundaries.

Some of the Staff's efforts to present new zoning laws to restrict these types of facilities did not pass muster, but in June of 2024, the Dunwoody Planning Commission ("Planning Commission") finally passed on a plan proposed by Staff with some modifications to make the proposed zoning scheme a bit less restrictive. For example, the Staff's proposal required a one and a half mile (7,500 feet) buffer

between these types of facilities, but the Planning Commission reduced it to one-half mile (2,640 feet). The Staff proposed a 1000-foot buffer from parks and primary and secondary schools, but the Planning Commission eliminated the buffer from parks. When the proposed ordinance as approved by the Planning Commission was presented to the City Council, however, some restrictions were increased prior to the final adoption of the ordinance in July of 2024. For instance, the one-half mile buffer was increased to one mile (5,280 feet) and the proposed buffer of 1000 feet from schools was doubled to 2000 feet with kindergartens added to the mix.

The 2024 changes to the Code's existing zoning scheme along with the administrative and legislative history related to the formulation and passage of the amendments and enforcement make clear that the City's purpose was to target a specific type of group residential treatment facilities, *i.e.*, those treating people with mental health issues and those treating people in recovery from substance use disorder. It was and is the overt, explicit, official policy of the City to prevent new residential substance use disorder treatment facilities from locating in Dunwoody and to reduce the number of group residential substance use disorder treatment facilities offering care for mental health and substance abuse issues in Dunwoody.

During the time that the City was actively considering the proposed ordinance, representatives of DRP spoke with City staff who assured them that DRP

6

would be able to use the facility at the North Peachtree Location as an extension of its Barclay Drive Location without having to go through any special land use procedures. NPH and DRP were lulled by those assurances into not mounting a legal challenge to the moratorium at that time and continuing with the renovations at the North Peachtree Location; however, once the City Council passed the new ordinance, it became clear that the City did not intend to allow Plaintiffs to operate as planned at that location. Plaintiffs would have to go through the highly expensive and lengthy process of attempting to obtain a special land use permit ("SLUP") which would also entail public hearings and battles with Dunwoody "concerned citizens."

Plaintiffs have requested that the Defendant make reasonable accommodation in the application of its zoning codes to allow DRP to operate an extension of its Barclay Drive residential group recovery home at the North Peachtree Location, which is separated from its operation at 4598 Barclay Drive by a City park. The Defendant has refused to make the requested accommodation and instead insists that DRP go through the onerous and arbitrary SLUP process with no assurances or guarantees of success. Plaintiffs believe that the SLUP process as it is fashioned in the Code provisions related to recovery communities provides only an illusory pathway forward for any new recovery communities in Dunwoody; therefore, Plaintiffs believe pursuing that process is futile.

The City has adopted and is enforcing land use regulations that overtly and intentionally discriminate against and that have a disparate impact upon people with disabilities, including Plaintiffs, in violation of the Equal Protection and Due Process Clauses of the United States Constitution and a number of disability and fair housing laws, including without limitation, the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, the Americans with Disabilities Act, (42 U.S.C. § 12131, et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794, et seq.), and the Vested Rights Doctrine. Plaintiffs seek declaratory, temporary, preliminary, and permanent injunctive relief to enjoin the City's conduct, as well as monetary damages, costs, and reasonable attorneys' fees.

## JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 29 U.S.C. § 794, et seq., 42 U.S.C. § 3613, 42 U.S.C. §1983, 42 U.S.C. § 12133. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims under state law because Plaintiffs' state law claims relate to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

2.   Declaratory and injunctive relief is sought pursuant to Rules 57 and

65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 3613, and 42 U.S.C. § 1983.

3.    Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(1) and (2) as all acts complained of occurred in Dekalb County, Georgia, which is within this District.

## PARTIES

4.    Plaintiff North Peachtree Holdings, LLC ("NPH") is a Georgia limited liability company which owns the premises known as 4821 North Peachtree Road, Dunwoody, Georgia.

5.    Plaintiff Dunwoody Recovery Place, LLC ("DRP") is a Georgia limited liability company which plans to operate an extension or annex of its Barclay Drive group recovery home at the North Peachtree Location where it will serve individuals with actual disabilities, i.e., individuals recovering from substance use disorders and/or co-occurring mental health issues.

6.    Plaintiffs Dave Edmondson, a resident of Kennesaw Georgia, and Sandy Dugan, a resident of Alpharetta, Georgia, are parents and legal guardians for John Doe 1 and John Doe 2, adult children with mental health and/or substance use disorder handicaps. Dave Edmondson and Sandy Dugan previously paid for John Doe 1 and John Doe 2 to receive treatment at DRP and/or its sister companies. John

Doe 1 and John Doe 2 would benefit from the additional locations and opportunities for treatment and residence at the North Peachtree Location or similar facilities that might locate in Dunwoody but for the restrictive and illegal zoning scheme implemented by the City.

7.      Plaintiff John Doe 3, an Alabama resident, is a person who has mental health and substance use disorder handicaps who has been in residential treatment programs in the past and who may seek treatment in a residential treatment program in Dunwoody, Georgia in the future. Plaintiff John Doe is contemporaneously filing his motion to proceed anonymously due to the sensitive nature of his disabilities and the stigma associated with them.

8.      Plaintiffs are aggrieved persons within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(i) and the Doe Plaintiffs and existing and potential residents of DRP's facility are "disabled" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and the Rehabilitation Act, 29 U.S.C. § 794.

9.      Defendant City of Dunwoody ("the City") is a political subdivision and municipal corporation within the State of Georgia and is organized under the laws of the State of Georgia with the power to sue and be sued. The City may be served with a copy of this Complaint by service on its mayor, Lynn Deutsch, at Dunwoody

City Hall, 4800 Ashford Dunwoody Road, Dunwoody, GA 30338.

10.    The City is the enforcement authority of zoning ordinances and building and safety codes over land and dwellings within its boundaries. The City is a "public entity" under Title II of the Americans with Disabilities Act (42 U.S.C. § 12131.) The City is a "person" under 42 U.S.C. §§1983, 1985(3) and 1986. The City is responsible for the acts of its agents and employees, including enactment and enforcement of its zoning code.

## STATUTORY AND REGULATORY FRAMEWORK

11.    In 1988, Congress amended the Fair Housing Act, 42 U.S.C. Section 3601, *et seq.* to extend the guarantee of fair housing to handicapped individuals.[2]  Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the Fair Housing Act ( 42 U.S.C. Section 3614a).

12.    Under the FHAA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment." 42 U.S.C. Section 3602(h); 24  C.F.R. Section

---

[2] The Fair Housing Act of 1968 is referred to as the "FHA" and the 1988 amendments to the law are sometimes referred to as the "FHAA."

100.201.

13.     The FHAA protects people with handicaps that include mental or emotional illness and those people who are recovering from substance abuse.

14.     The FHAA provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. 3604(f)(2).

15.     The federal regulations implementing the FHAA specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap.  24 C.F.R. 100.70 (d)(4).

16.     The Americans with Disabilities Act (the "ADA") requires that no qualified individual with a disability shall, by reason of a disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity, or be subjected to discrimination of any such entity. 42 U.S.C. Section 12132.

17.     The federal regulations implementing the Americans with Disabilities Act prohibit a public entity from discriminating against a qualified individual with a disability in administering a licensing program in a manner that

subjects qualified individuals with disabilities to discrimination on the basis of disability. Nor may a public entity establish requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability. 35 C.F.R. 35.130(6).

18.    The federal regulations also make it unlawful for a public entity to determine the site or location of a facility that has the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination. 35 C.F.R. 35.130(4)(1).

19.    The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

20.    The Fourteenth Amendment to the United States Constitution's equal protection clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

21.    The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

22.    Under the doctrine of vested rights, a property owner has a vested right

13

to continue lawful uses of its property and is not required to obtain a special use (or other) permit in order to continue lawful preexisting uses. *See W.M.M. Properties, Inc. v. Cobb County,* 255 Ga. 436, 339 S.E.2d 252 (1986); *Stone Mountain Indus., Inc. v. Wilhite,* 221 Ga. 269, 144 S.E.2d 357 (1965); *Banks County v. Chambers of Ga., Inc.,* 264 Ga. 421, 444 S.E.2d 783 (1994); *Barker v. County of Forsyth,* 248 Ga. 73, 76, 281 S.E.2d 549 (1981); *Cannon v. Clayton County,* 225 Ga. 63, 335 S.E.2d 294 (1985).

## STATEMENT OF FACTS

23.     Section 27-111 of the Dunwoody Code of Ordinances ("the Code") states that it "contains a description of the use classification system used to classify principal uses in this zoning ordinance." That ordinance "classifies principal land uses into five major groupings, which are referred to as use categories." Section 27-111(1). Those five major use groupings are: residential, quasi-public and institutional, commercial, industrial, and agricultural. Each use category is then "further divided into more specific 'subcategories.'" Section 27-111(2). "Use subcategories classify principal land uses and activities based on common, functional, product, or physical characteristics, such as the type and amount of activity, the type of customers or residents, how goods or services are sold or delivered and site conditions." *Id*. "Some use subcategories are further broken down to identify specific use, business or activity types that are regulated differently than

the parent subcategory as a whole." Section 27-111(3). Use tables in Sections 27-57 and 27-72 of the Code identify uses allowed in residential districts and in nonresidential and mixed-use districts. Section 27-111(5) of the Code states: "When a use cannot readily be classified into a use category/subcategory or appears to fit into multiple categories/subcategories, the community development director is authorized to determine the most similar, and thus most appropriate, use category/subcategory based on the actual or projected characteristics of the principal characteristics of the principal use or activity in relationship to the use category and subcategory descriptions provided in this section." That same section authorizes the community development director, in making such determinations, "to consider all of the following:

1.    The types of activities that will occur in conjunction with the use;

2.    The types of equipment and processes to be used;

3.    The existence, number and frequency of residents, customers or employees;

4.    Parking demands associated with the use; and

5.    Other factors deemed relevant to a use determination."

24.    Prior to 2023, there was no "use" listed or described in the Dunwoody Zoning Code that specifically addressed drug rehabilitation centers, residential

substance abuse treatment facilities, or other facilities for the treatment of drug dependency; however, such facilities had in fact received business licenses from the City of Dunwoody and were allowed to operate in O-I Office Institutional and R-M 150 Multi-dwelling Residential Districts along with similar uses such as assisted living facilities and nursing homes.

25.    Prior to January of 2023, DRP's sister company, Dunwoody Behavioral Health Center, LLC ("DBHC") was already operating a residential mental health treatment center treating adults with a range of psychological disorders at 4594 Barclay Drive, Dunwoody, Georgia, 30338 which was zoned as O-I – Office Industrial District.

26.    DRP operates a substance addiction group residential treatment program at 4598 Barclay Drive, Dunwoody, Georgia, 30338 (the "Barclay Drive Location") in the building adjacent to its sister company's 4594 Barclay Drive mental health facility.

27.    By email dated December 16, 2022, Andrew Merker ("Merker"), on behalf of NPH, advised Allegra DeNoor with the City's Planning & Zoning Department that Plaintiffs were looking to purchase property at 4821 North Peachtree, *i.e.*, the North Peachtree Road location. That property had previously housed a 30-bed assisted living and memory care home called Summers Landing Tilly Mill and/or Sunrise Assisted Living of Dunwoody. Notably, that property was

16

adjacent to the park. The North Peachtree Location was zoned as R-M 150 Multi-dwelling Residential District.

28.     In January of 2023, NPH bought the property described herein as the North Peachtree Location, which is at the corner of Tilly Mill and North Peachtree Road, but just across the park from the Barclay Drive Location. DRP planned to use the North Peachtree Location as an extension of its group residential substance addiction treatment program operated at the Barclay Drive Location because it was just .41 of a mile from the Barclay Drive Location. In that same vein, DRP has planned to move some of its existing clients to the new building in light of some changes in mental health and DATEP licensing schemes.

29.     Sometime prior to January 23, 2023, another substance abuse recovery company, Landmark Recovery, notified the City's Zoning Department that it proposed to operate an inpatient substance abuse treatment facility at 4484 North Shallowford Road which previously was home to a 58-bed assisted living facility. The property was zoned as O-I Office Institutional District. In his letter to Landmark dated on or about January 23, 2023, Paul Leonhardt, the City's Deputy Director of Community Development ("Leonhardt"), informed Landmark that: "the Dunwoody Zoning Ordinance specifically references the use categories 'drug rehabilitation center' and 'other facility for treatment of drug dependency' in Sec. 27-331, Sec. 27-334, Sec. 27-334, Sec. 27-356, and Sec. 27-358" and "[b]ased on the above

referenced proposed use description, we find that the proposed Landmark facility is best classified as a drug rehabilitation center or other facility for treatment of drug dependency." The code sections referenced by Mr. Leonhardt, however, were not use categories at all but instead were simply public notice requirements for proposed zoning map amendments and proposed special land use permits. Mr. Leonhardt also represented to Landmark that "due to Sec. 27-111(4)d, which states, 'Uses that are not listed in the use table and that cannot be reasonably interpreted to fall within the use categories described in Article III, Division 1 are also prohibited,'" if a business license was proposed for a substance abuse treatment facility at this location, the City would be required to deny it. Mr. Leonhardt stated that Landmark's proposed use could not reasonably be interpreted to fall within the definition of nursing home or hospital.

30.     In an email dated February 10, 2023, Landmark's in-house attorney, Michelle Lubbert ("Lubbert"), provided a detailed explanation to Richard McLeod ("McLeod"), the City's Director of Community Development, about the licensing and operations of the proposed facility and demonstrated that the operation would be most similar to a nursing home. Thereafter, on or about February 16, 2023, City officials including the Director of Community Development and Paul Leonhardt participated in a Teams meeting with Ms. Lubbert.

31.     In a February 27, 2023, email to Mr. McLeod, Mr. Leonhardt, and

others, Ms. Lubbert refuted the continued arguments made by the City and provided a detailed legal analysis of the applicable Code sections. In her email, she opined that the City's actions were in violation of the Americans with Disabilities Act, and she requested a reasonable accommodation.

32.    Also on February 27, 2023, however, "the City Council issued a moratorium on drug rehabilitation centers and other facilities for the treatment of drug dependency." Memorandum of July 10, 2023, to Dunwoody's mayor and the Dunwoody City Council ("City Council") from Paul Leonhardt.

33.    Over a year later, after the moratorium was passed, Mr. Leonhardt stated in a public meeting before the Planning Commission on June 11, 2024, that the moratorium was triggered by someone making inquiries about acquiring property to operate a substance abuse treatment facility.

34.    Months after the Moratorium was passed, according to a July 10, 2023 memorandum by Mr. Leonhardt as Planning & Zoning Manager, to the Mayor and City Council, with the subject line "Text Amendment for Residential Substance Abuse Treatment Centers," the Planning & Zoning Staff initially had proposed adding a new "use" to the Dunwoody Zoning Code that described the new use as "drug rehabilitation center, or other facility for treatment of drug dependency." After the City's legal counsel reviewed the matter with the staff, however, they "made subtle clarifying changes to the definition" which were reviewed by legal counsel

19

and the designation name was changed to "residential substance abuse treatment center."

35.     On information and belief, neither Mr. McLeod, Mr. Leonhardt, nor anyone else with the City responded to Ms. Lubbert's request for reasonable accommodation for Landmark under the ADA; instead, on March 2, 2023, Mr. McLeod finally responded to Ms. Lubbert's February 27, 2023 email advising her that "this week the city council passed a moratorium on anything that deals with drug dependency including business license applications for 180 days."

36.     In May of 2024, the State of Georgia repealed code sections that imposed more rigid additional hearing and notice provisions regarding halfway houses, drug rehabilitation centers, or other facilities for treatment of drug dependency. The Dunwoody Code contained those same discriminatory provisions - provisions which Mr. Leonhardt relied upon in his January 23, 2023, letter advising Ms. Lubbert that the City would deny a business license for a proposed substance abuse treatment facility at 4484 North Shallowford Road.

37.     On information and belief, from at least January or February of 2023 to July of 2024, the City, its Staff, and legal advisors strategized how best to limit residential treatment of substance abuse within the City boundaries. During that time, the Staff and City legal counsel set out to study how other cities limited group residential substance abuse facilities under their zoning schemes. They wrestled with

20

how to accomplish their plan for restricting or preventing residential substance abuse treatment center facilities from locating in Dunwoody.

38.    Videos of Planning Commission and City Council meetings reflect the trajectory of the City's desire to limit any facilities offering residential treatment programs and housing arrangements. Officers and employees of Plaintiffs and other providers of group residential treatment programs appeared and spoke at those meetings. Residents of Dunwoody spoke in favor of curtailing these programs. Others spoke against the new proposed restrictions and limitations, emphasizing the recognized drug crisis prevalent in the city, state, and nation, and in some instances warning that the City's actions could be discriminatory.

39.    Eventually, after earlier versions of a new ordinance were rejected, Staff presented a revised proposed ordinance that was presented to the Planning Commission June 11, 2024. The proposed ordinance lumped residential substance abuse treatment center facilities together with residential mental health facilities and called them "Recovery Communities."[3] Under the proposed ordinance no such

---

[3] According to Mr. Leonhardt's PowerPoint presentation, the Staff had two use categories in the proposed ordinance: one for "all small-scale forms of housing for handicapped residents" and one for larger-scale facilities for mental health and substance use disorders that "are more similar to a nursing home." The proposed ordinance referred to the small-scale forms of housing for handicapped residents by the descriptor "community residences." As Plaintiffs' Complaint concerns the larger scale facilities, community residences are not discussed at length here, but the same concerns apply to the City's treatment of those homes and handicapped residents.

"recovery community" could locate: within 7,500 feet (1.5 miles) from any other such recovery community, within 1,000 feet from any primary or secondary school, or within 1,000 feet of any park.

40.    In answer to a question raised by Planning Commissioner Scott Brown at the June 11, 2024 Planning Commission meeting, about the reason for proposing a 7,500 (1.5 mile) buffer between residential substance abuse treatment centers, Mr. Leonhardt explained that initially Staff proposed 1,000 and 2,000 foot distances which allowed for one facility per every eleven typical Dunwoody-sized lots, but "it was brought to us that … that was not something that could be passed . . . it was too liberal, too liberal."

41.    At the public hearing on June 11, 2024, in connection with the Planning Commission meeting, a former City Councilman, Robert Wittenstein, spoke in opposition to the proposed ordinance. He said that Dunwoody was failing the challenge of how to treat the most vulnerable among us. He pointed to the portion of the proposed ordinance that provided for a 1,000-foot buffer from any parks and urged the Planning Commission to delete that provision. First, he said that to prevent people already struggling from having access to green space seemed terribly mean spirited. Second, he said that the park buffer requirement was designed specifically to prevent a proposed facility from opening at Tilly Mill and Peachtree in a vacant assisted living facility and if he were the owners of that property, he would sue the

City. That property is the North Peachtree Location at issue in this lawsuit.

42.     Andrew Merker spoke on behalf of DRP and its sister companies at the June 11, 2024, Planning Commission meeting in opposition to the proposed ordinance. He told the Planning Commission that his organization had helped 5,000 people in Dunwoody. He spoke of the need for treatment for adolescents and mentioned that a high school student at Dunwoody High School had died of an overdose the preceding week. Mr. Merker emphasized that there were no adolescent treatment facilities in the City. He said that his organization had two facilities, the North Peachtree/Tilly Mill facility and another one at North Shallowford (the old Phoenix assisted living facility that Landmark had wanted to open) that they had been waiting for eighteen months to open because of the moratorium. Further, he said that with the buffer provisions in the proposed ordinance there was no property available to open a substance abuse treatment facility outside those areas and if there was, he would buy it the following day. Mr. Merker spoke of the difficulty of gaining approval when the community was saying "hey, not in my backyard."

43.     At the June 11, 2024, Planning Commission Meeting, Mr. Leonhardt stated that under the proposed ordinance the majority of uses would require special land use permits or SLUP's which would require public notice and allow for community input. When asked what the genesis of the buffer requirements was, Mr. Leonhardt stated: "The buffer requirements are to space the communities out so that

there are not multiple communities in a neighborhood without going to the community first, so it is a tool to require a give and take process like a special land use process." Mr. Leonhardt admitted that these new restrictions only applied to residential programs. One of the commissioners, Elizabeth Shin, noted that with the buffers, only a sliver of the northern side of the City was not in the restricted area, but that most of that area was zoned residential which would also mean that any facility attempting to locate there would have to go through the SLUP process.

44.    In the June 11, 2024, Planning Commission meeting, when asked why there was a required buffer from parks, Mr. Leonhardt admitted that the reason was that proximity to parks was one of the items of concerns they "heard" from the community. They put the buffer requirement in as a way to proactively address the concerns expressed by the community to City Council members, *i.e.*, their voting constituents.

45.    Asking for clarification, the Chairman of the Planning Commission stated: "I also want to understand that we are here, and this is being rewritten because we're exposed right now. I mean, we are under a moratorium, but we have potential exposure because here because we do not have a pathway for which these businesses to potentially follow to operate legally in the city." Mr. Leonhardt confirmed the Chair's understanding. Another commissioner questioned whether there had been applications for these types of facilities previously. Mr. Leonhardt had to admit that

24

there were existing facilities that have been permitted in the past through different avenues like partially as a care home and partially as a medical facility. He represented that when "someone came in from outside the City" and proposed to open a facility his office had determined that it did not have authority to permit a drug treatment facility. On information and belief, his reference was to Landmark.

46.     The Planning Commission reduced the distance buffer between recovery communities to 2,640 feet (1/2 mile), eliminated the park buffer requirement, and approved the 1,000-foot buffer requirement from schools.

47.     The revised proposed ordinance then went to the City Council for the second reading on July 22, 2024. Despite paying lip service to the need to balance the availability of mental health and substance abuse care, the City doubled down on an isolationist plan that would limit group residential treatment programs and impose geographical buffers to segregate people with those disabilities from the community. In the July 22, 2024, City Council meeting, Mr. Leonhardt stated: "We've heard . . . it resonated about these two different types of facilities at the first read. We've heard about an interest in having increased buffers for the larger type facilities for recovery type communities." The Staff responded to that "interest," by doubling distance requirements, *i.e.*, increasing the distance buffers between recovery communities and existing recovery communities to 5,280 feet (one mile) and the distance buffers from recovery communities to schools to 2,000 feet. In his

presentation to the City Council, Mr. Leonhardt included demonstrative charts that showed the impact of those distance buffers on proposed new recovery communities. In short, the impact is to severely limit new recovery communities in the City. Councilman Rob Price recognized this and specifically raised concerns about it in the meeting. He stated: "The whole reason I ask this question is because to me this is healthcare. . . . I was happy with the earlier stuff, but I understand the concerns so I'm willing to vote for something a little bit more protective because pretty much everything is going to come to the Council for a look with these new numbers anyway. When we're having to pick out little tiny parts of the community here and there, that tells me that this is pretty restrictive. It's probably more restrictive than I would like."

48.    Mr. Leonhardt stated that new recovery communities could go in those areas, but only by obtaining a special land use permit or SLUP, a process that would require public notification and two public hearings in front of the Planning Commission and the City Council. Thus, every proposed recovery community would face upwards to a year of costly red tape before having any possibility of locating a group residential substance abuse treatment facility in most of Dunwoody, even in areas where these facilities were already allowed. Mr. Leonhardt stated that the proposed ordinance would maintain protections and room for community input regarding any facilities locating in those areas.

49.    The proposed ordinance was anything other than straightforward, as former City Councilman, Robert Wittenstein had observed in the June 11, 2024, Planning Commission meeting. First, the ordinance identified new use categories, Community Residences and Recovery Communities and then identified the areas in which they were permitted:

| Zones | Community Residence | Recovery Community |
|---|---|---|
| Single-dwelling Residential | Special Use | Not Permitted |
| Multi-dwelling Residential | Permitted Use | Permitted Use |
| Commercial/Perimeter Center | Permitted Use | Permitted Use |
| Dunwoody Village | Special Use | Special Use |

Thus, at first blush, it appears that a Recovery Community like DRP is permitted of right to open a facility in a Multi-dwelling Residential zone, but the second part of the City's plan was to put so many buffers in place that effectively, with existing facilities, there are no areas in a Multi-dwelling Residential zone where a residential substance abuse facility could locate without having to go through the lengthy,

expensive, and rigorous SLUP process. Regardless of whether such a facility is able to get around the buffers, a proposed facility has to provide detailed operations information before it can receive a license even in zones where it is a permitted use. Finally, if as expected by the City, such a proposed facility has to go through the SLUP process, the City has rigged the system to automatically deny any such facility that it does not want by making the proponent prove rigorous criteria by a clear and convincing evidence standard.

50.     The first reading of the proposed ordinance was at the City Council Meeting of July 8, 2024. At that meeting, Dunwoody residents spoke in opposition to the planned facility for the North Peachtree Location and "drug rehab" facilities in general. Judith Miller Hoffer's comments were indicative of the concerns of Dunwoody residents regarding the location of drug abuse treatment facilities in the community. She stated: "It has come to my attention that there is construction going on at a facility at the corner of Tilly Mill and North Peachtree.[4] That is right near our neighborhood. . . ." She said it used to be a senior care facility that had about thirty patients at a time. She said she could not think of a worse place for a "drug rehab facility" because it was adjacent to or near two schools, a park, three churches, a Jewish Center with daycare facility, baseball fields, and there were lots of kids

---

[4] This is the North Peachtree Location.

28

everywhere around there. She stressed that the patients are not locked in . . . they are allowed to go outside and basically should not be allowed there.

51.    Likewise, Cathy Adams Carter speaking for the Dunwoody North Civic Association expressed concerns on the part of their members about how rehab centers in residential areas might adversely impact their real estate values, crime, and quality of life for the community. She stressed that many people with drug addiction issues also had dual diagnoses, and she feared people leaving treatment might become homeless in the park near the North Peachtree Location. Another resident who was formerly on the Board of Zoning Appeals for Dunwoody stated that drug rehab centers do not belong in residential areas. She stressed that "we do not know the backgrounds" of those people.

52.    Two people spoke in opposition to portions of the proposed ordinance at the July 8, 2024, meeting. A former councilman, Robert Wittenstein, encouraged the City Council to reduce the distance buffer to one-quarter of a mile. He mentioned that the City has no distance requirements between massage parlors, for example. A resident, a lawyer, encouraged the City Council to consider the incredible opioid crisis that had arisen in Georgia over the past couple of years with more than 8,000 opioid related deaths. She expressed concern that the ordinance's restrictions on numbers of people in treatment in community residences were not rationally related to the need.

53.     Before taking public comments, the mayor stated for the record in the July 8, 2024, City Council meeting that this is an ordinance change and there was no specific **rezoning** before the City Council.

54.     When questioned during the July 8, 2024 City Council meeting about the need for zoning enforcement related to existing substance abuse treatment facilities, Mr. Leonhardt admitted that the most common complaint about those facilities related to smoking, so there was not much need for enforcement. When questioned about accreditation and licensure of such facilities, Mr. Leonhardt stated that the State is over that. One councilman was concerned about whether the City could go back in and access the facilities to ensure later that they remained in compliance with those State regulations. Another councilman said: "I want to be careful about what we do or don't do -- the whole purpose behind ***closing this loophole*** is so that the City Council can review these matters. . . . So, I want to make sure we treat these entities no differently than we would any other business other than the methodology by which they locate to get that business permit . . . the process we're trying ***to close the loophole on***." (Emphasis added.)

55.     Mr. Leonhardt told the City Council at its July 22, 2024, meeting, that that the City's zoning code had "a gap that leaves the City legally vulnerable." Mr. Leonhardt represented to the City Council that the use table did not include substance use disorder treatment facilities, and therefore Staff proposed to "close that gap." In

fact, however, as Ms. Lubbert skillfully demonstrated to the City in her correspondence from January and February of 2023, the City did not need a specific use in the use table in order to determine whether a use was appropriate in a given zoning location; rather the Code provided the methodology for making that determination by considering the most similar uses. Indeed, the City had licensed seven such facilities prior to deciding that it needed to issue a moratorium on such facilities. In fact, in his presentation to the City Council, Mr. Leonhardt acknowledged that the use option he was promoting, *i.e.*, "Recovery Community," would be a "Larger-scale option for mental health and substance use disorders that is more similar to a nursing home." The Councilman who repeatedly stated that they were trying to **close a loophole** accurately stated what they were really trying to do. The fact of the matter was that the so-called gap the City wanted to close was the one that already allowed residential substance abuse programs to operate in areas such as Multi-dwelling Residential, Office and Institution, and Commercial zones. The Staff couched its actions in terms of adding a new use rather than rezoning, but the City was in fact rezoning through restricting the addition of new residential substance abuse treatment facilities in most areas of Dunwoody by adding overlapping distance requirements that would automatically subject any such new facilities to vast expenditures of time and capital just to ascertain whether the community and City Council would allow a special land use permit.

56.     The City Council adopted the ordinance as revised at its July 22, 2024, meeting. In his summary to the City Council, Mr. Leonhardt said the City Council that the City was vulnerable because "federal law has changed **over the past couple of years** where generally people with substance addiction issues and who are undergoing a supervised rehabilitation are considered protected class under federal law and that's the same class that people with other disabilities are falling under." There was, however, no such change "over the past couple of years" as Mr. Leonhardt represented. The Fair Housing Amendments Act of 1988 (FHAA) designated substance abuse as a disability, making it illegal to discriminate against people with substance use disorders in housing, including people in recovery from substance use disorders. Also, substance use disorder has been considered a disability under the Americans with Disabilities Act (ADA) since 1990. The real question being asked by the City was *how do we forestall the addition of residential substance abuse programs in our community* or perhaps *how do we close the loophole that allowed these programs into our community in the first place?* Mr. Leonhardt told the City Council how: "We are proposing a different solution. . . spinning it based on land use impacts."

57.     No other type of living or business arrangement is more strictly controlled in the City of Dunwoody than what the City now characterizes as Recovery Residences and Recovery Communities. For example, the City has put

32

limitations on how close pawn shops and convenience cash businesses can be to other pawn shops and convenience cash businesses (1,000 feet) and how close convenience cash businesses can be to liquor stores (1,000 feet), but there is no specified distance such businesses must be from anything else. And the City has placed limitations on how close "sexually oriented businesses can be to residential zones (500 feet), alcohol dispensaries (600 feet), places of worship (1000 feet), and elementary schools (1000 feet), but there is no limitation on how close those businesses can be to each other. Animal care/boarding and veterinary clinics must be at least 100 feet from residential zones, but there is no restriction on how close they can be located to each other. Party houses must be at least 150 feet from residential zones, but there are no restrictions on how close they can be to each other. There are no limitations or distance restrictions whatsoever on homeless shelters and transitional facilities. The only use with similar distance limitations is medical cannabis dispensaries; however, even those do not have the additional operational and oversight requirements imposed on Recovery Residences and Recovery Communities in Sec. 27-135.1. - Community residences and  Sec. 27-146.1. - Recovery communities.

58.    The City's Code places Community Residences and Recovery Communities under the Residential use category, Sec. 27-112(2), Group Living along with nursing homes, homeless shelters, transitional housing facilities, and

child-caring institutions. The Code defines community residence as "a residential living arrangement for five or fewer (although more may be allowed if a special land use permit is granted) unrelated individuals with disabilities living as a single functional family in a single dwelling unit who are in need of the mutual support furnished by other residents of the community residence as well as the support services, if any, provided by any staff of the community residence." Sec. 27-112(2)(e). A recovery community is defined as: "Multiple dwelling units located on a single parcel, or a series of adjacent lots under unified ownership, providing a drug-free and alcohol-free living arrangement for people in recovery from substance use disorders or acute mental health disorders, (i) that are not held out to the general public for rent or occupancy and, (ii) which taken together, do not emulate a single family and are under the auspices of a single entity or group of related entities." Sec. 27-112(2)(f). There are no restrictions or limitations on any of the other four group living uses with regard to distance from other like facilities or schools. Thus, the only two types of uses under the group living category to be subject to such restrictions and limitations are the two categories that involve disabled individuals suffering from mental illness or substance abuse addition.

59.    Sec. 27-135.1 provides:

(a)    Community Residences are subject to the following regulations:

34

(1)    A community residence shall be located at least 2,640 linear feet from the closest existing community residence or recovery community. Distance is measured from the nearest lot line of the entire parcel of the proposed community residence to the nearest lot line of the entire parcel of the closest existing community residence or recovery community. A community residence located less than 2,640 linear feet from the nearest existing community residence or recovery community shall first obtain a special land use permit.

(2)    A community residence shall be located at least 1,000 linear feet from the closest existing public or private elementary or secondary school. The term public or private elementary or secondary school shall include any facility that offers education in one or more of the grade levels from kindergarten through 12th grade. Distance is measured from the nearest lot line of the entire parcel of the proposed community residence to the nearest lot line of the entire parcel of the closest existing public or private elementary or secondary school. A community residence located less than 1,000 linear feet from the nearest existing public or private elementary or secondary school shall first obtain a special land use permit.

(3)    A community residence shall be limited to five or fewer residents plus applicable staff providing support services. A community residence exceeding five residents shall first obtain a special land use permit.

(4)    The operator of a community residence shall submit an operations plan that includes (but is not limited to):

   a.   Any state licenses the community residence intends to obtain,

   b. Any applicable charters, accreditations, or memberships such as an Oxford House Charter or Georgia Association of Recovery Residences membership,

   c. A description of staff training and licensing requirements,

d. A description of how the community residence will emulate a household and be operated to achieve stability, a structured environment, and community integration,

e. Rules and practices governing how the community residence is operated and that will protect residents from abuse, exploitation, fraud, theft, insufficient support, use of illegal drugs or alcohol, and misuse of prescription medications, and

f. A description how transition planning for departing residents will be administered and which factors and resources will be considered.

(5)    Residents shall not be registered as a sex offender and residents shall not be actively on parole or probation and be ordered to reside at a specific address.

60.    Sec. 27-146.1 provides:

(a)    Recovery communities are subject to the following regulations:

(1)    A recovery community shall be located at least 5,280 linear feet from the closest existing community residence or recovery community. Distance is measured from the nearest lot line of the entire parcel of the proposed recovery community to the nearest lot line of the entire parcel of the closest existing community residence or recovery community. A recovery community located less than 5,280 linear feet from the nearest community residence or recovery community shall first obtain a special land use permit.

(2)    A recovery community shall be located at least 2,000 linear feet from the closest existing public or private elementary or secondary school. The term public or private elementary or secondary school shall include any facility that offers education in one or more of the grade levels from kindergarten through 12th

grade. Distance is measured from the nearest lot line of the entire parcel of the proposed recovery community to the nearest lot line of the entire parcel of the closest existing public or private elementary or secondary school. A recovery community located less than 2,000 linear feet from the nearest existing public or private elementary or secondary school shall first obtain a special land use permit.

(3)    The operator of a recovery community shall submit an operations plan that includes (but is not limited to):

    a. Any state licenses the recovery community intends to obtain such as a State of Georgia residential Drug Abuse Treatment and Educational Program license,

    b. Any applicable charters, accreditations, or memberships such as an Oxford House Charter or Georgia Association of Recovery Residences membership,

    c. A description of staff training and licensing requirements,

    d. A description of how the recovery community will be operated to achieve stability, structured environment, and community integration,

    e.    Rules and practices governing how the recovery community is operated and that will protect residents from abuse, exploitation, fraud, theft, insufficient support, use of illegal drugs or alcohol, and misuse of prescription medications, and

    f.    A description how transition planning for departing residents will be administered and which factors and resources will be considered.

(4)    Residents shall not be registered as a sex offender and residents shall not be actively on parole or probation and be ordered to reside at a specific address.

(5) A recovery community shall be located on a parcel that is exclusively for said purpose. Co-location in a multi-family residential community with units for sale or lease for general dwelling purposes shall not be permissible. It shall be a separate violation of this provision for each resident and for each 24-hour day or part thereof that such resident is present.

61.    Under the City's new Code provisions applicable to Community Residences and to Recovery Communities, when a proposed community residence or a proposed recovery community is required to obtain a special land use permit ("SLUP"), which by virtue of the extensive buffer requirements, as recognized by City Council member Rob Price, is basically every time one is in fact proposed, the proponent is forced to establish Draconian review criteria by "clear and convincing evidence" in order to receive a SLUP. The process, by design, is to eliminate the probability of a proponent ever running the gauntlet of public opinion, political duplicity, and expense necessary to obtain the SLUP. The virtually impossible hurdles enacted by the City are part of the year and a half long effort by the City to ensure that no new group residential substance abuse treatment facilities and group residential mental health facilities locate within the City of Dunwoody.

62.    The City's evident intent in creating the zoning scheme proposed by the Staff and ultimately passed by the City Council was to segregate people with mental health and substance abuse illnesses from people in the community who do not have these stigmatized disabilities. For example, a group residential home that

would include housing and care for persons with physical disabilities such as paralysis or traumatic brain injuries could not also offer housing and care for persons with mental health or substance abuse disabilities because recovery communities must be located on a parcel that is exclusively for that purpose. Under the regulations passed by the City, recovery communities cannot co-locate in existing apartment communities. In other words, a recovery community could not lease a floor in an apartment building to provide supervised group treatment and housing to people with mental health or substance abuse illnesses. Effectively, people with mental health and substance abuse disabilities are isolated into pods that must be at least a mile apart from each other.

63.     Under the new ordinance, before being able to obtain business licenses to operate in the City, both recovery communities and recovery residences are required to provide the City with detailed operations plans, evidence of affiliations and accreditations with certain organizations, detailed rules and procedures related to the treatment of any such group residents, and details related to how any such residents will be transitioned out of the program. The City does not require similar evidence from other organizations.

64.     Even though group residential substance abuse recovery homes could be permitted and zoned in the same manner as nursing homes, the City intentionally set out to create a special use category to carve out facilities that housed and treated

people with mental health and substance abuse disabilities. Thus, for example, a nursing home providing care to nondisabled elderly persons is not subject to the same limitations and restrictions as group homes providing similar levels of care to those persons with mental health and substance abuse disabilities. Further, by imposing those limitations and restrictions, the City has substantially limited the ability of residents with mental health and substance abuse disabilities to find residential treatment and housing in their community.

65.    Prior to the passage of the February 27, 2023 moratorium on new drug, mental health, and alcohol rehabilitation centers, on January 18, 2023, DRP applied for an Occupational Tax Certificate ("OTC") for the North Peachtree Location. Due to the moratorium DRP was unable to obtain a business license from the City for the North Peachtree Location. In the February 27, 2023, City Council meeting, during discussion of the proposed moratorium, a council person asked whether the moratorium would affect anyone trying to set up a business at that time. Mr. Leonhardt, started to answer about having received an inquiry but he was cut off by another councilman who apparently did not want the matter to be aired publicly. After receiving instructions from the councilman, Mr. Leonhardt answered no, even though DRP had at that time already applied for its OTC for the North Peachtree Location. In similar fashion to how the City handled the Landmark situation, the City slow-walked the process for a business license for DRP to operate at that

location and began a protracted investigation into what state licenses DRP intended to hold, et cetera.

66.     DRP has spent more than $1,000,000.00 renovating the facility at the North Peachtree Location but has been unable to open the facility due to the moratorium and the resulting changes the City made to its Code in 2024. The facility would provide twenty-six more beds for its current operation at the Barclay Drive Location, and it would utilize the same staff.

67.     Substance Use Disorder is a Mental Health disorder according to the DSM-5. As Mr. Leonhardt explained in his July 10, 2023, memorandum: "People with substance addition issues and undergoing a supervised rehabilitation program are considered a protected class and are included as individuals with disabilities under the Americans with Disabilities Act. While local governments can regulate facilities providing services for these groups, the regulations cannot be stricter than those for similar uses."

68.     Plaintiffs are aggrieved persons under the Fair Housing Amendments Act of 1988, 42 U.S.C. Section 3602(d) and (i) who have been injured by the City's discriminatory conduct and have suffered damages, economic loss, and a loss of civil rights as a result. Further, DRP's potential future residents, constitute persons who have a "handicap" under the Fair Housing Amendments Act of 1988, 42 U.S.C. Section 3602(h).

41

69.    The premises described above are dwellings within the meaning of section 802(b) of the Fair Housing Act, 42 U.S.C. Section 3602(b).

70.    The operation of group residential substance abuse recovery homes does not constitute a threat to the health or safety of the residents of Dunwoody and would not result in substantial physical damage to the property of others.

71.    The effect of the City's actions is to deny needed housing and treatment to disabled persons and to segregate them from other residents of Dunwoody by imposing greater limitations and restrictions on their access to housing and supervised treatment and recovery than other nondisabled residents of Dunwoody.

72.    The effect of the conduct of the City is to limit the housing and treatment opportunities of unrelated disabled persons in recovery from substance use disorder and persons with mental health issues by denying them the right to live together as a group in any but a handful of zoning districts on the perimeter of the City, well away from amenities that are available for other nondisabled residents of the City.

73.    In general, people in recovery do not have transportation; therefore, limiting them to commercial and industrial areas on the outer perimeters of the City and depriving them of parks and green spaces, *et cetera*, ordinarily available to other

non-disabled persons is in violation of the Fair Housing Act and the Americans with Disabilities Act.

74.    The City is treating disabled residents in a discriminatory fashion and is imposing far more stringent life safety and building code and land use requirements on available facilities for this group of unrelated individuals living together than it imposes upon individuals living together who do not suffer from disabilities stigmatized by society.

75.    The City has acted under color of state law in failing to affirmatively further fair housing in its code enforcement activities with the purpose and effect of discriminating against the Doe Plaintiffs solely because of their handicaps, and implementing and applying zoning laws and ordinances so as to deny them the residential opportunities available to persons related by blood, marriage or adoption, or other groups of similarly situated unrelated persons.

76.    The City will suffer no harm or adverse impact if DRP is allowed to extend its Barclay Drive operations to add the beds available to it in its North Peachtree Location.

77.    Plaintiffs are suffering irreparable harm as a result of Defendant's actions. They have no adequate remedy at law.

78.    The City has denied Plaintiffs due process of law by the arbitrary manner in which it has classified group residential homes for treatment of mental

43

and substance abuse illnesses.

79.     The City has orchestrated, passed, and implemented a zoning scheme which is facially discriminatory towards people with mental health and substance abuse disabilities.

80.     Regardless of the City's intent, in fact the City has orchestrated, passed, and implemented a zoning scheme which has a disproportionate adverse impact on people with mental health and substance abuse disabilities as opposed to other, nondisabled people.

81.     The zoning framework orchestrated, passed, and implemented by the City discriminates against mental health and substance use disorder handicaps on its face and serves no legitimate government interest.

82.     Because the zoning framework was orchestrated and enacted by the City for the purpose of limiting Plaintiffs' provision of and access to group residential substance abuse and mental health services in Dunwoody, requesting accommodation or review of these actions by the City would be futile. Plaintiffs believe that the cumbersome SLUP provisions in Code section 27-146.1 are a mere sham to chill any desire to open such a facility and also a means to allow the City unfettered discretion to slow walk any applications for a SLUP for six to eight months or more before finally rejecting the application.

**INJURIES**

44

83.    Because of the City's unlawful acts and practices, Plaintiffs have suffered violations of their federal statutory and constitutional rights, and their rights under Georgia statutory and common law, loss of the value, use, and enjoyment of their properties, frustration, and loss of current and future income, and have been subjected to enforcement of invalid ordinances and to unreasonable and unlawful regulation. Accordingly, Plaintiffs are entitled to compensatory and punitive damages.

84.    There now exists an actual controversy between the parties regarding the City's duties under federal and state laws. Accordingly, Plaintiffs are entitled to declaratory relief of their federal and state law claims under 42 U.S.C. § 3613, 42 U.S.C. §1983, 42 U.S.C. § 12133, the United States Constitution, the Vested Rights Doctrine, as well as Rule 57 of the Federal Rules of Civil Procedure.

85.    Unless enjoined, the City will continue to engage in the unlawful acts and the pattern and practice of discrimination described above. Plaintiffs have no adequate remedy at law. Plaintiffs are now suffering and will continue to suffer irreparable injury from the City's acts and the pattern and practice of discrimination unless relief is granted by this Court. Accordingly, Plaintiffs are entitled to injunctive relief of their federal and state law claims under 42 U.S.C. § 3613, 42 U.S.C. §1983, 42 U.S.C. § 12133, the United States Constitution, the Vested Rights Doctrine, as

well as Rule 57 of the Federal Rules of Civil Procedure.

## CLAIMS FOR RELIEF

## COUNT I: VIOLATION OF THE FAIR HOUSING ACT, 42 U.S.C. § 3601, *et seq.*

86.     Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

87.     "Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002)(citing H.R. Rep. No. 100-711, at 24 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2185)(stating that amendments to the FHA include protections against disability discrimination "also apply to state of local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps").

88.     The FHA prohibits at least three types of discrimination.

89.     First, it "prohibits intentional discrimination – that is, disparate treatment." *Avenue 6E Investments, LLC v. City of Yuma, Ariz.* (9th Cir. 2016) 818 F.3d 493, 502 ("Avenue 6E"). A government cannot "zone land or refuse to zone land out of concern that minorities [such as people with disabilities] would enter a neighborhood." *Id.*

90.     Second, the FHA prohibits "disparate impact" discrimination — that is, "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Avenue 6E, at 503, citing Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522. A disparate impact claim "'permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification'" and target "'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities." *Id.* (quoting *Texas Dep't of Hous. & Cmty. Affairs*, 135 S.Ct. at 2522).

91.     Finally, FHA discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

92.     Substance use disorder is a physical or mental impairment which substantially limits one or more of such person's major life activities and thus, is defined as a "handicap" or disability under 42 U.S.C. § 3602(h) for people in recovery. The Doe Plaintiffs and existing and potential residents of DRP's group residential substance addiction treatment facility are recovering from substance use disorders and/or other co-occurring mental health issues, and therefore, are members

of a protected class. The City knew the residents of NPH and DRP's proposed group home would be adults with disabilities.

93.    Plaintiffs DRP and NPH are "aggrieved person[s]" as defined in the FHA. 42 U.S.C. § 3602(d) & (i); *Pac. Shores, supra*, 730 F.3d at 1157, n. 16.

94.    The City's spacing ordinance draws a mile circle around each existing group residential recovery facility, thereby precluding new group residential recovery homes from opening in most of the City of Dunwoody.

95.    The City's zoning scheme which severely restricts and limits the availability of group residential substance addiction and mental health treatment programs in the City of Dunwoody and which segregates and isolates any such facilities to certain areas is precisely the sort of isolation of handicapped persons from the mainstream of society that the FHAA was enacted to forbid.

96.    The City's draconian requirements for group residential substance abuse and mental health treatment programs to overcome concerns about crime, drug use, safety, *et cetera*, by clear and convincing evidence before the City will consider a SLUP, are based on generalized perceptions about disabilities and unfounded speculations about threats to safety that have been soundly rejected by courts who have addressed these issues.

97.    By excluding Plaintiffs from the City in order to satisfy their own and/or the community's discriminatory intent, the City has unlawfully made

48

unavailable or denied a dwelling to the Doe Plaintiffs and DRP's existing and potential residents on the basis of disability. Defendant's actions are in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (f) and its implementing regulations.

98.    Defendant is discriminating against the Doe Plaintiffs and DRP's existing and potential residents in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, by denying and otherwise making residency and treatment at the premises located at the North Peachtree Location unavailable to them because of their handicaps.

99.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* by applying the Code in an arbitrary and capricious manner and thereby denying the Doe Plaintiffs and DRP's existing and potential residents the ability to receive treatment and their choice of residence within the boundaries of the City.

100.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* by discriminating against the Doe Plaintiffs and DRP's existing and potential residents because of their handicaps in the terms, conditions, and privileges of residing at group recovery homes such as DRP and in the provision of services and facilities in connections with those dwellings.

101.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* by employing its zoning and building codes to segregate and reject the Doe Plaintiffs

49

and DRP's existing and potential residents and those facilities that serve them because of their handicaps.

102.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by providing its municipal code enforcement services differently to the Doe Plaintiffs and DRP's existing and potential residents and those facilities that serve them because of their handicaps.

103.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. because under the FHA, a governing entity such as the City may not facially single out handicapped persons and apply different rules to them.

104.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by restricting and attempting to restrict the Doe Plaintiffs and DRP's existing and potential residents, because of their handicaps, their choice to receive treatment and reside at DRP at the North Peachtree Location and other such facilities so as to discourage and obstruct choices in that community and neighborhood.

105.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by coercing, intimidating, threatening, and interfering with Plaintiffs because of the handicaps of the Doe Plaintiffs and DRP's existing and potential residents, in the exercise and enjoyment of their right to seek treatment and reside at a group residential treatment home of their choice.

106.    Defendant is violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*.

by failing to make reasonable accommodations in the application of its zoning and other codes so as to afford the Doe Plaintiffs and DRP's existing and potential residents, an equal opportunity to use and enjoy the safe haven of the group recovery home at the North Peachtree Location and other facilities like DRP.

107.     The City's conduct as set forth above injured Plaintiffs by committing discriminatory housing practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of the FHA. 42 U.S.C. § 3601 *et seq*.

108.     The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and DRP's existing and potential residents including the Doe Plaintiffs.

## COUNT II: TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§12131, *et seq*.

109.     Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

110.     Title II of the Americans with Disabilities Act ("ADA") "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity.'"
*Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) ("*Pac. Shores*"), quoting 42 U.S.C. § 12132.

111.   The ADA "prohibits governmental entities from discriminating against disabled persons through zoning." *Pac. Shores*, *supra*, 730 F.3d at 1157.

112.   Like the FHA, the ADA prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. 42 U.S.C. § 12132; 28 C.F.R. § 35.130; *see, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

113.   The City is a "public entity" as defined in Title II of the ADA. 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

114.   The Doe Plaintiffs and DRP's existing and potential residents are "qualified individuals with a disability" as defined in Title II of the ADA, and therefore, are members of a protected class. 42 U.S.C. § 12131; 28 C.F.R. § 35.104; 28 C.F.R. § 35.108.

115.   The ADA provides Plaintiffs DRP and NPH with a cause of action, even though they are not themselves individuals with a disability. *Pac. Shores, supra*, 730 F.3d 1142, 1157, n. 17 (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir.2002)); 42 U.S.C. § 12133.

116.   The City is violating the rights of the Doe Plaintiffs and DRP's

existing and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by discriminating against them and the facilities that desire to serve them, denying and otherwise making residency and treatment at North Peachtree Location unavailable to them because of their handicaps.

117.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by applying the Code in an arbitrary and capricious manner and thereby denying them their choice of residing and receiving treatment in a safe haven within the boundaries of the City of Dunwoody.

118.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq., by discriminating against them because of their handicaps in the terms, conditions, and privileges of residing at the North Atlanta Location and other group recovery and mental health centers and receiving the provision of services by DRP and other such facilities in connections with those dwellings.

119.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential residents, rights under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by employing its zoning, life safety and building codes to segregate and reject them because of the social stigma of their handicaps.

120.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential  residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing licensing and permit requirements to provide municipal  code enforcement  services  that  is not  equal  to  groups  of  related nondisabled persons and groups of unrelated disabled persons.

121.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential  residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing licensing and permit requirements to provide municipal  code enforcement  services  that  is not as  effective  in affording  equal opportunity to obtain the same benefit,  as groups  of related  nondisabled  persons and groups of unrelated disabled persons.

122.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by providing  its  municipal  code  enforcement  services differently  to  the  Doe  Plaintiffs  and the facilities that provide group homes and treatment to them because of the social stigma associated with their handicaps.

123.    The City is violating the rights of the Doe Plaintiffs and DRP's existing and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing  licensing  and  permit  requirements,  a requirement not imposed upon other groups of related nondisabled persons, to deny

Individual Plaintiffs and DRP's existing and potential  residents because of the handicap of the residents the same enjoyment of any rights, privilege, advantage, or opportunity enjoyed by nondisabled persons.

124.    The City's conduct as set forth above injured Plaintiffs by committing discriminatory zoning practices and failing to grant Plaintiffs' request for reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of Title II of the ADA. 42 U.S.C. § 3601 *et seq*.

125.    The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of the Doe Plaintiffs and DRP's existing and potential residents.

## COUNT III: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794, ET SEQ.

126.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

127.    Section 504 of the Rehabilitation Act ("Section 504") provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

128.   Like the ADA, Section 504 applies to zoning "because zoning 'is a normal function of a governmental entity.'" *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 731 (9th Cir. 1999) ("BAART"), quoting *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir.1997); 29 U.S.C. § 794(b)(1)(A).

129.   Like the FHA and ADA, Section 504 prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. 29 U.S.C. § 794(a); *Alexander v. Choate*, 469 U.S. 287, 300-301, (1985) (disparate impact claims cognizable under Section 504); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008) (failure to accommodate claims cognizable under Section 504).

130.   Plaintiffs are informed and believe and based thereon, allege that at all times relevant herein, the City received federal financial assistance. For example, the City announced on its website post of December 20, 2022, that it was awarded $7.75 million in federal funding through the Atlanta Regional Commission ("ARC") for two projects to improve connectivity and safety for pedestrians and cyclists. (*See* https://www.dunwoodyga.gov/Home/Components/News/News/379/16.)   Also,  in October of 2022, the City approved grants of $810,000.00 in federal funding allocated to Dunwoody as part of the American Rescue Plan for ten local nonprofits to support those still struggling from the impact of the COVID-19 pandemic. (*See* https://summitcounseling.org/dunwoody-approves-grants-for-nonprofits/.)  Further,

56

Dunwoody was slated to receive $850,000.00 for the Georgetown segment of the Top End 285 Trail as part of Congressman Hank Johnson's $15.8 million Community Project Funding which was part of a spending bill signed into law by President Joe Biden in March of 2024. (*See* https://roughdraftatlanta.com/2024/03/12/proposed-georgetown-trail-connector-receives-federal-funding/).

131. The Doe Plaintiffs and DRP's existing and potential residents are "qualified individuals with a disability" as defined in Section 504, and therefore, are members of a protected class. 29 U.S.C. § 705(20).

132. Section 504 provides Plaintiffs DRP and NPH with a cause of action, even though Plaintiffs are not themselves individuals with a disability. 29 U.S.C. § 794a(a)(2); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 333-336 (6th Cir. 2002) ("Because Plaintiff has presented evidence that it was denied a zoning permit because it cares for and/or associates with individuals who have disabilities, Plaintiff has standing to bring this suit on its own behalf.").

133. The City's conduct as set forth above intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons. The City injured Plaintiffs by committing discriminatory zoning practices and failing to grant Plaintiffs' request for reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of

57

Section 504. 29 U.S.C. § 794, et seq.

134.   The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of the Doe Plaintiffs and DRP's existing and potential residents.

## COUNT IV: VIOLATION OF PLAINTIFFS' CIVIL RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983

135.   Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

136.   The Fourteenth Amendment to the United States Constitution's Equal Protection Clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

137.   A government violates the Equal Protection Clause if it "zone[s] land or refuse[s] to zone land out of concern that minorities would enter a neighborhood." *Ave. 6E Investments, LLC v. City of Yuma*, Ariz., 818 F.3d 493, 502 (9th Cir. 2016) ("Avenue 6E").

138.   "When there is a proof that a discriminatory purpose has been a motivating factor in [a] decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("Arlington Heights").

139.   The City, acting under color of state law, is violating Plaintiffs' civil

rights under 42 U.S.C. Section 1983 by utilizing its Code and its method of administering its zoning codes with the purpose of subjecting the Doe Plaintiffs and DRP's existing and potential residents to discrimination solely on the basis of their handicaps which are viewed by the City, its leaders, and many of its residents as socially unacceptable or stigmatized.

140.    The City, acting under color of state law, is violating Plaintiffs' civil rights under 42 U.S.C. Section 1983 by subjecting the Doe Plaintiffs and DRP's existing and potential residents solely on the basis of their handicaps, to discrimination under its code enforcement activities.

141.    The City, acting under color of state law, is violating Plaintiffs' civil rights under 42 U.S.C. Section 1983 by denying Plaintiffs the equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution by applying the City's code enforcement activities in a manner so as to arbitrarily and irrationally deny Plaintiffs, because of the handicaps of the Doe Plaintiffs and DRP's existing and potential  residents the residential opportunities afforded to both groups of related nondisabled persons and unrelated disabled persons.

142.    The City's conduct as set forth above injured Plaintiffs by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Equal Protection

Clause.

143.    Plaintiffs have been injured by the City's discriminatory and unconstitutional conduct and have suffered damages as a result.

144.    The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of the Doe Plaintiffs and DRP's existing and potential  residents.

## COUNT V: DEPRIVATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983

145.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

146.    The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

147.    "Constitutional scrutiny of zoning regulations is heightened . . . when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma, Wash*., 720 F.2d 1126, 1128 (9th Cir.1983).

148.    The United States Supreme Court "'has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment'" and "when the government intrudes on choices concerning family living arrangements, this Court

must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977)(quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974)).

149.    A zoning decision must also be set aside if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co*., 272 U.S. 365, 395 (1926).

150.    The City's decisions to deny Plaintiffs' request for reasonable accommodation were not related to any substantial zoning interest.

151.    The City's conduct as set forth above injured Plaintiffs by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Due Process Clause.

152.    Plaintiffs have been injured by the City's discriminatory and unconstitutional conduct and have suffered damages as a result.

153.    The City's conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of the Doe Plaintiffs and DRP's existing and potential residents.

## COUNT VI: VESTED RIGHTS DOCTRINE
## (PENDENT STATE LAW CLAIM)

154.     Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

155.     Under Georgia's doctrine of vested rights, a property owner has a vested right to continue lawful uses of its property and is not required to obtain a special use (or other) permit in order to continue lawful preexisting uses. *See W.M.M. Properties, Inc. v. Cobb County,* 255 Ga. 436, 339 S.E.2d 252 (1986); *Stone Mountain Indus., Inc. v. Wilhite,* 221 Ga. 269, 144 S.E.2d 357 (1965); *Banks County v. Chambers of Ga., Inc.,* 264 Ga. 421, 444 S.E.2d 783 (1994); *Barker v. County of Forsyth,* 248 Ga. 73, 76, 281 S.E.2d 549 (1981); *Cannon v. Clayton County,* 225 Ga. 63, 335 S.E.2d 294 (1985).

156.     Plaintiffs and their sister corporations have been, and were at all times relevant herein, lawfully operating their facilities, in full compliance with all state and local laws prior to February 27, 2023 when the City imposed a moratorium on drug rehabilitation centers and other facilities for the treatment of drug dependency which last until July 22, 2024 when the City Council voted to adopt new zoning laws that changed the status quo for Plaintiffs, their sister companies, and other entities providing residential group homes for the care and treatment of persons suffering

from addiction and mental illness.

157.    Prior to July 22, 2024 (when the City changed the zoning laws for facilities like those operated by Plaintiffs and their sister companies via enactment of Code sections 27-112 ("Residential Use Category") and 27-146.1 ("Recovery Communities"), the City had never previously imposed a 5,280 feet (one mile) separation requirement on Plaintiffs' properties, for the purpose of restricting their geographical location in relation to the location of other such group homes. In reliance on this, Plaintiffs invested substantial financial resources to continue their lawful operations of the properties they owned as of July 22, 2024, as it had successfully done so in the past, and invested monies acquiring and/or modifying properties in reliance on the existing Code and zoning laws as well as assurances and representations made by City staff and officials.

158.    However, as of July 22, 2024, after Plaintiffs and their sister companies had been lawfully operating their facilities and preparing to open new facilities or extensions of their existing facilities such as DRP at Barclay Drive, the City adopted new zoning regulations applicable to all such group homes that offered residential treatment and care of disabled and handicapped people suffering from substance use disorders and other mental health issues, whereby any future operation of any such residential group facility was prohibited from obtaining a business license or permit without obtaining a special land use permit or SLUP unless such

location was more than 5,280 feet from any such other "recovery communities," and at least 2000 feet from any school– irrespective of whether properties like those owned and operated by Plaintiffs and their sister companies are located outside the City of Dunwoody.

159.    Plaintiffs have a vested right to continue their lawful operation of their existing facilities and open their operation at the North Peachtree Location, irrespective of the City's new zoning regulations – which overtly discriminate against residential group recovery homes such as Plaintiffs' and which prevent people with disabilities from being a continued and integral part of the community.

160.    Plaintiffs justifiably are concerned that the City will use its new zoning law to refuse to renew their existing business licenses, to prevent Plaintiffs from adding to any existing facilities and to prevent any new facilities from opening in the Dunwoody area and that the new zoning laws will affect their ability to operate facilities outside the City of Dunwoody if those facilities would be within the forbidden 5,280 feet restriction imposed by the new ordinances.

161.    As such, Plaintiffs seek declaratory relief and injunctive relief to enjoin the City from enforcing its new zoning regulations against Plaintiffs and the North Peachtree Location, since Plaintiff DRP has a vested right to extend its operations at the North Peachtree Location consistent with its preexisting use.

64

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court awards the following relief:

1.      Declare that the City acted unlawfully under the Fair Housing Act, the Americans with Disabilities Act, the Rehabilitation Act, and other federal and state laws as alleged herein;

2.      Declare that the City's enactment, administration, application, and enforcement of its zoning regulations violate the rights of the Doe Plaintiffs and DRP's existing and potential  residents, under the Fair Housing Act, the Americans with Disabilities Act, Fourteenth Amendment, and other federal and state laws alleged herein;

3.      Declare that the City has illegally discriminated against Plaintiffs by arbitrarily and capriciously applying its municipal and zoning codes against them, by interfering with the Plaintiffs' equal opportunity to use and enjoy a dwelling, in violation of the Federal Fair Housing Act;

4.      Declare that the use of DRP's use of the North Peachtree Location as a group residential recovery home for the treatment of handicapped persons to be in conformance with the Code of the City of Dunwoody;

5.      Declare that the City's new zoning laws as applicable to Plaintiffs are unconstitutional;

6.      Enter  a  temporary  restraining  order,  preliminary  and  permanent

65

injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any one of them from enforcing unlawful or discriminatory zoning regulations, and from taking actions that either directly or indirectly interfere in any way with Plaintiffs' abilities to provide housing and treatment in a group residential setting to groups of unrelated, disabled persons who are in recovery;

7.     Enter a temporary restraining order and a preliminary and permanent injunction enjoining the Defendant from taking actions either directly or indirectly which would interfere in any way with Plaintiffs opening and operating the group residential recovery home at the North Peachtree Location pursuant to 42 U.S.C. §3613;

8.     Enter a temporary restraining order and a preliminary and permanent injunction enjoining the City of Dunwoody, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them from interfering with the operation of DRP at the North Peachtree Location as a group recovery home for disabled persons and interfering in any way with the right of the Plaintiffs to reside in that facility and to receive treatment there pursuant to 42 U.S.C.A. § 3613;

9.     Award compensatory damages to be determined at trial but in no event less than FIVE MILLION DOLLARS ($5,000,000.00);

10.    Award punitive damages to be determined at trial but in no event less than THREE MILLION DOLLARS ($3,000,000.00);

11.    Grant an award of reasonable costs and attorneys' fees; and

12.    Order such other relief as this Court deems just and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Respectfully submitted this 14th day of May 2025.

**JONES & PALMER, LLC**

*/s/ M. Boyd Jones*
_____
M. Boyd Jones
Georgia Bar No. 400891

*/s/ Betsy Palmer Collins*
_____
Betsy Palmer Collins
Georgia Bar No. 334968

*Attorneys for Plaintiffs*

639 Whitlock Avenue, SW, 2nd Floor
Marietta, Georgia 30064
boyd.jones@jonespalmerlaw.com
betsy.collins@jonespalmerlaw.com
T: 770-575-8303
F: 770-485-8967